SHEPPARD MULLIN RICHTER & HAMPTON, LLP
Thomas R. Kaufman (SBN 177936)
tkaufman@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067
Telephone: (310) 228-3700/Facsimile: (310) 228-3701

Greg S. Labate (SBN 149918)
glabate@sheppardmullin.com
Ruben D. Escalante (SBN 244596)
rescalante@sheppardmullin.com
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626
Telephone: (714) 513-5100/Facsimile: (714) 513-5130

SEYFARTH SHAW LLP
Christopher A. Crosman (SBN 190336)
ccrosman@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200/Facsimile: (310) 201-5219

Attorneys for Defendants
FULL SPECTRUM LENDING, INC., COUNTRYWIDE HOME LOANS, INC., and COUNTRYWIDE FINANCIAL CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGGIE WALLACE, ERICK SOSA, on behalf of themselves and similarly situated employees,<br><br>       Plaintiffs,<br><br>   v.<br><br>COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, FULL SPECTRUM LENDING, INC, DOES 1-10, INCLUSIVE,<br>       Defendants. | Case No. SACV 08-01463 JST (MLGx)<br><br>Assigned to Hon. Josephine Staton Tucker<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DECERTIFY CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Appendix of Evidence and Proposed Order filed under separate cover]<br><br>**Date:**    **May 21, 2012**<br>**Time:**    **10:00 a.m.**<br>**Crtrm:**   **10-D** |

1  TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

2  PLEASE TAKE NOTICE that on May 21, 2012, at 10:00 a.m. in Courtroom

3  10-A of the United States District Court, Central District of California, 411 West

4  Fourth Street, Santa Ana, CA 92701-4516, Defendants Full Spectrum Lending, Inc.,

5  Countrywide Home Loans, Inc., and Countrywide Financial Corporation,

6  ("Defendants") will move for an order decertifying all classes in this case.

7  This motion is made pursuant to Federal Rule of Civil Procedure 23 on the

8  grounds that the development of the record and the controlling law now shows that

9  this case cannot properly be tried as a class action.  A certified class may be

10  properly decertified at any time that the evidentiary record reveals that the grounds

11  for originally certifying the class no longer apply.  The central allegation in this case

12  is that Full Spectrum's voluntary back pay program paid the affected employees, as

13  a class, for fewer overtime hours than they actually worked in the aggregate.  Judge

14  Guilford certified the class on the basis that Plaintiffs Reggie Wallace, Travin Lu'I,

15  and Erik Frates ("Plaintiffs") could establish classwide underpayment with

16  collective proof.  However, the only form of collective proof Plaintiffs have is a

17  survey conducted by Plaintiffs' expert, Philip Gorman, which is both inadmissible

18  and incapable of establishing classwide liability.  Plaintiffs will also seek to offer

19  anecdotal testimony from a non-random, unspecified number of class members.

20  In short, the Plaintiffs only possible method of proof here is the "Trial by

21  Formula" method that the United States Supreme Court has deemed to violate a

22  defendant's due process rights. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

23  2550, 2560-61, 180 L. Ed. 2d 374 (2011) (rejecting "trial by formula" approach;

24  clarifying a more stringent standard for "commonality"); see also *Duran v. U.S.*

25  *Bank, N.A.*, 203 Cal. App. 4th 212 (2012) (ordering decertification based on

26  application of *Dukes* holdings in wage/hour class action).  Accordingly, Defendants

27  have a very strong basis for decertification.

28  This motion is based upon this notice, the attached Memorandum of Points

1

and Authorities; the concurrently filed Appendix of Evidence, the pleadings, records and files in this action, and any oral and documentary evidence as may be presented at the hearing on the motion.

DATED:  April 6, 2012          SHEPPARD MULLIN RICHTER & HAMPTON LLP


                               By      _____/s/ Thomas R. Kaufman_____
                                              THOMAS R. KAUFMAN
                                             Attorneys for Defendants
                                       FULL SPECTRUM LENDING, INC.,
                                     COUNTRYWIDE HOME LOANS, INC., and
                                        COUNTRYWIDE FINANCIAL
                                               CORPORATION

# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ............................1

II.    RELEVANT FACTS ............................................................................2

    A.     The Nature of the Account Executive Job ...............................2

    B.     Full Spectrum's Reclassification and Back Pay Program ......................3

    C.     The Claims Certified Are All Premised on the Notion That Class Members Were Misclassified and Worked More Overtime Than They Received Through the Back Pay Program....................................6

    D.     The Only Form of Collective Proof Plaintiffs Have to Prove Their Case Is The Flawed Phil Gorman Survey .....................................7

    E.     The Court Allowed Depositions of Some Gorman Survey Respondents, Most of Whom Changed Their Answers.........................8

    F.     Plaintiffs Seek to Prove Their Overtime Claim Through Anecdotal Evidence and the Gorman Survey .........................................9

    G.     Plaintiffs Have Not Presented Any Plan Regarding How They Will Prove Classwide Fraud With Collective Proof............................10

III.   LEGAL ARGUMENT .................................................................................12

    A.     Standard for Decertification.................................................................12

    B.     All Plaintiffs' Claims Should Be Decertified Because They Necessarily Depend on an Impermissible "Trial by Formula" Approach to a Class Trial....................................................................13

1

<u>TABLE OF CONTENTS (CONT'D)</u>

2

<u>Page</u>

3      C.   The Gorman Survey, Plaintiffs' Sole Collective Proof Should Be

4           Excluded From Evidence ......................................................................18

5           1.   Gorman's Survey Does Not Meet *Daubert* Standards ...............18

6                a.   Gorman Failed to Follow Established Protocols,

7                     Which Has Led to Expert Exclusion in Other Cases .......20

8                b.   Gorman's Survey Suffers from the "Analytical

9                     Gap" Discussed in Other Cases Excluding Survey

                     Experts ............................................................................23

10          2.   Plaintiffs Lack Any Other Substitute Collective Proof That

11               Can Separate Class Members Who Were Underpaid from

12               Those Who Were Overpaid ........................................................26

13     D.   Plaintiffs Also Lack Collective Proof Necessary to Establish

14          Fraud, Which Should Trigger Decertification of That Claim...............27

15          1.   Essential Elements Of Fraud Claim............................................27

16          2.   Plaintiffs Lack Collective Proof Of Actual Reliance .................28

17  IV.   CONCLUSION ...................................................................................30

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

<u>Federal Cases</u>

*Aburto v. Verizon California, Inc.*
    2012 WL 10381 (C.D. Cal. January 3, 2012).......................................................13

*Albert v. Warner-Lambert Co.*
    234 F. Supp. 2d 101 (D. Mass 2002)....................................................................20

*Arch v. American Tobacco Co., Inc.*
    175 F.R.D. 469 (E.D. Pa. 1997) .....................................................................17, 18

*Akaosugi v. Benihana Nat'l Corp.,*
    2012 U.S. Dist. LEXIS 42093 (N.D. Cal. Mar. 26, 2012) .................................19

*Cruz v. Dollar Tree Stores, Inc.*
    2011 WL 2682967 (N.D. Cal. July 8, 2011) ......................................................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993) .............................18, 19

*Daubert v. Merrell Dow Pharms., Inc.*
    43 F. 3d 1311 (9th Cir. 1995) ........................................................................19, 22

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) .........................................................................19, 24

*General Electric Co. v. Joiner*
    522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ...................................22

*General Tel. Co. of the Southwest v. Falcon*
    457 U.S. 147, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) ...................................12

*Hughes v. Winco Foods*
    2012 WL 34483 (C.D. Cal. January 4, 2012)......................................................13

*In re Hydrogen Peroxide Antitrust Litig.*
    552 F.3d 305 (3rd Cir. 2009)..............................................................................13

*Lanphere Enterprises, Inc. v. Jiffy Lube International, Inc.*
    2003 U.S. Dist. LEXIS 16205 (D. Or. Jul 9, 2003) ......................................23, 24

*Lust v. Merrill Dow Pharms., Inc.*
    89 F. 3d 594 (9th Cir. 1996).................................................................................18

-iii-

# TABLE OF AUTHORITIES (CONT'D)

Page(s)

*Marlo v. United Parcel Service*
   639 F.3d. 942 (9th Cir. 2011) ..................................................................20, 21

*Martinez v. Terex Corp.*
   241 F.R.D. 631 (D. Ariz. 2007) .................................................................. 19

*Novak v. Boeing Co.*
   2011 WL 7627789 (C.D. Cal. December 19, 2011) ................................... 13

*Sepulveda v. Wal-Mart Stores, Inc.*
   237 F.R.D. 229 (C.D. Cal. 2006)................................................................ 29

*Stearns v. Ticketmaster Corp.*
   655 F.3d 1013 (9th Cir. 2011) ................................................................... 29

*In re Taco Bell Wage and Hour Actions*
   2011 WL 4479730 (E.D. Cal. Sept. 26, 2011) .......................................... 13

*Wal-Mart Stores, Inc. v. Dukes*
   131 S. Ct. 2541 (2011) .......................................................... 13, 14, 26

*Wamboldt v. Safety-Kleen Sys.*
   2010 U.S. Dist. LEXIS 105004 (N.D. Cal. September 20, 2010)...................... 13

*Whiteway v. FedEx Kinkos Office and Print Servs., Inc.*
   2009 U.S. Dist. Lexis 1273602 (N.D. Cal. Oct. 2, 2009) .................................. 26

State Cases

*Anderson v. Deloitte & Touche*
   56 Cal. App. 4th 1468........................................................................ 27

*City of Hope National Medical Center v. Superior Court*
   8 Cal. App. 4th 633 (1992)................................................................. 27

*Dunbar v. Albertsons*
   141 Cal. App 4th 1422 (2006).......................................................... 29

*Duran v. U.S. Bank, N.A.*
   203 Cal. App. 4th 212 (2012)............................................. 1, 14, 16, 17

*McCullah v. So. Cal. Gas Co.*
   82 Cal. App. 4th 495 (2000).............................................................. 26

-iv-

# TABLE OF AUTHORITIES (CONT'D)

Page(s)

Federal: Statutes, Rules, Regulations, Constitutional Provisions

Federal Rule of Civil Procedure, Rule 23 ........................................................ *passim*

Federal Rule of Evidence, Rule 702 ................................................... 18, 24

## I.      <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Under recent pronouncements from the United States Supreme Court that have clarified the standards for class certification under Rule 23, this action no longer may properly proceed as a class action.

Judge Guilford certified this action more than three years ago on the central assumption that Plaintiffs' claims for fraud and failure to pay overtime could be tried collectively.  The two key allegations concerning all of Plaintiffs' claims are that Full Spectrum (1) misclassified all of its Branch Account Executives ("Branch AEs") as exempt; and (2) failed voluntarily to pay them enough back pay to compensate them fully for the overtime they worked during the relevant period. Implicit in Judge Guilford's rulings was an assumption that a finder of fact could establish classwide liability by (1) determining that the class, on the whole, was misclassified, (2) calculating the dollar value of the total overtime the class worked during the relevant period, and (3) concluding that this figure was more than the $10.1 million Full Spectrum paid through its 2005 voluntary back pay program.

As explained in Section III-B, the assumption that a trial in this case can focus on the aggregate underpayment to the class is no longer tenable.  Such a trial procedure constitutes "Trial by Formula," which has been deemed impermissible under *Dukes v. Wal-Mart*, as further explicated in the recent California decision, *Duran v. U.S. Bank, N.A.*, 203 Cal. App. 4th 212 (2012).  As such, this significant change in the law should compel this Court to decertify all the claims in the case.

In addition, as explained in Section III-C, even if sampling could in some cases be used to establish liability, Plaintiffs lack the necessary expert testimony to establish classwide liability here with a sufficient scientific basis.  Plaintiffs rely on the badly flawed survey of Phil Gorman.  Gorman's survey should be excluded for failure to satisfy the *Daubert* standards for admissibility of expert testimony. Without the Gorman survey, Plaintiffs simply have no collective proof to establish classwide liability, justifying decertification of this action.

1

Finally, as explained in Section III-D, Plaintiffs' claim for common law fraud is subject to decertification on an independent basis because the developed record shows that individualized issues predominate on that claim.  The only common issues Judge Guilford identified when he certified the fraud class was that the same acknowledgment letter was sent to each member of the class containing certain statements that were either objectively true or false (e.g., whether Full Spectrum really concluded that the average overtime AEs worked was five hours per week).  For common law fraud, however, there must be commonality as to the elements of *reliance and damages* as well, and neither of those elements can be established collectively.  Rather, the development of the record shows that it is a highly individualized inquiry as to whether any given class member relied on the acknowledgment letter and whether such reliance, if any, led to damages.  Thus, at the very minimum, the Court should decertify the common law fraud claim.

## II.   RELEVANT FACTS

### A.   The Nature of the Account Executive Job

The certified class consists of individuals formerly employed by Full Spectrum as Branch AEs between January 26, 2002 and December 31, 2004.[1] Branch AEs were loan officers who worked in Full Spectrum branches throughout the United States.  They dealt primarily with subprime borrowers and their main job duty was to perform "needs-based selling," in which they would analyze each borrower's particular needs and then provide financial counseling as to how those needs could best be met through Full Spectrum's mortgage loan products.[2]  Their duties mirrored those of the "loan originators" in the Department of Labor's

---

[1]    The granting of Defendants' motion for summary adjudication narrowed the class to those individuals who worked for Full Spectrum in California, with respect to claims to recover overtime pay.  (See Docket # 332, Order dated December 14, 2011).  The motion for partial summary judgment did not address the fraud claims of non-California Branch AEs.  Accordingly, for purposes of the fraud claim, the class remains nationwide in scope.

[2]    Defendants' Appendix of Evidence ("AOE"), Ex. A (Zielke Decl. ¶ 4).

2

September 8, 2006 opinion letter, FLSA 2006-31, which the DOL found generally qualified an employee for the FLSA's administrative exemption.  Nonetheless, Plaintiffs contend that the class was uniformly misclassified.

In addition to disputing the exemption issue, the parties also dispute how much overtime class members worked.  What is not disputed, however, is that the amount of overtime worked by the class varied significantly from one Branch AE to another.  The parties' true dispute here is whether the overtime that class members worked per week was more or less, ***on average***, than the roughly five hours per week for which the class was paid through the voluntary back pay program.

**B.**      **Full Spectrum's Reclassification and Back Pay Program**

This lawsuit arose from Full Spectrum's voluntary back pay program for Branch AEs.  In late 2004, Countrywide resolved two wage and hour class actions (*Butler* and *Walker*) that settled overtime claims of ***Call Center*** AEs.  ***Branch*** AE positions were expressly excluded from the *Butler/Walker* settlements.  Although Full Spectrum denies that Branch AEs were misclassified, Full Spectrum opted to reclassify its Branch AEs across the United States as non-exempt effective January 1, 2005, and to pay both current and former Branch AEs some back overtime despite the absence then of any class action attacking their exempt status.[3]

For California-based employees, Full Spectrum provided back pay for a three-year period (January 1, 2002 to December 31, 2004), to mirror the Labor Code's statute of limitations.  For non-California employees, the voluntary back pay program reached back two years, consistent with the FLSA's two-year statute of limitations.  The Branch AEs were sent letters concerning the back pay program, called "acknowledgment letters."[4]

Because Full Spectrum treated the Branch AEs as exempt, it did not have

---

[3]      AOE, Ex. B (Jagielski Decl. ¶¶ 2-3).

[4]      AOE, Ex. B (Jagielski Decl. ¶ 4).

1  employee time records.  Thus, Full Spectrum performed a two-step process to assess

2  the total amount of backpay it would pay to the Branch AEs.[5]

3       First, Full Spectrum had an investigator survey a sample of Branch Managers

4  across the country to obtain estimates of much overtime their Branch AEs worked.

5  This investigation revealed a wide variation in overtime worked from branch to

6  branch, and from AE to AE.  Based on internal discussions among consultants, legal

7  representatives and executive management of Countrywide, Full Spectrum

8  concluded that Branch AEs, on average, worked *about five hours of overtime* per

9  week.  Full Spectrum thus decided to offer back pay at that rate to all Branch AEs

10  who worked for Full Spectrum during the relevant time period.[6]

11       Full Spectrum also instituted an "appeals" procedure by which individual

12  Branch AEs could obtain additional back pay, where applicable.  To that end, Full

13  Spectrum sought through the acknowledgment letters to obtain input from the

14  Branch AEs as to their individual hours worked.  More specifically, the letters (1)

15  explained that Full Spectrum was conducting a voluntary reclassification with back

16  pay; (2) disclosed that Full Spectrum lacked time records for the Branch AEs; (3)

17  explained that Full Spectrum's own investigation had revealed an average of five

18  hours of overtime per week; and (4) set forth the calculation of overtime the

19  employee would have earned assuming five hours of overtime per workweek during

20  the covered period.  The calculation assumed the employee worked five hours of

21  overtime every single week (i.e., no reductions were assumed for holidays,

22  vacations, etc.).[7]   Branch AEs were advised that, if they believed the offered

23  payment met or exceeded what they actually worked, they could sign and return the

24  letter, and they would received the payment offered.  Alternatively, a Branch AE

25  ―――――――――――――

     [5]    AOE, Ex. B (Jagielski Decl. ¶ 5).

26       [6]    AOE, Ex. B (Jagielski Decl. ¶ 5), D (Wallace Dep. 64:7-67:9, 80:12-

27  81:4), H, J, Y (Phenix Dep, 14:18-15:24, 31:10-32:20), AA (showing variations among different Branch AEs as to hours worked).

28       [7]    AOE, Ex. B (Jagielski Decl. ¶ 6).

could contact the HR department to provide additional information showing the employee worked more overtime, and this evidence would be considered individually.  It was left to Branch AEs whether to participate, and nothing in the letter told them that signing a letter barred them from initiating a lawsuit. [8]

A total of 4,313 acknowledgement letters were issued to current and former Full Spectrum Branch AEs.[9]   Former employees were mailed letters.  Branch Managers provided current employees with their letters, and subsequently met with them to explain the process.  Full Spectrum provided Branch managers with written "Manager Guides" that provided guidelines as to how to assist the Branch AEs with the process. The Guides specifically noted that "our objective is that an employee's decision to sign the acknowledgement is completely voluntary and accurately reflects the employee's view that the average hour estimate and calculation is reasonable."  The Guides provided that, in the event an employee disagreed with the overtime estimate, the manager should obtain all relevant information from the employee as to overtime claimed to have been worked, and notify them that their appeal would be considered by HR.  The Manager Guides contained a three-page explanation of the Back Pay Appeal Process whereby employees could request more overtime pay if they felt they had worked more than the five-hour estimate. [10]

Most Branch AEs (3,676) signed and returned their acknowledgement letters and received the back pay Full Spectrum offered them.  Another 500 employees failed to respond to the letters.   148 Branch AEs appealed to Human Resources for more back pay.  An appeals committee of Full Spectrum executives, assisted by a team of investigators, spent months looking into these appeals, and determined that about half of these employees should have their payment increased, while others failed adequately to substantiate their claims.  Significantly, through the back pay

---

[8]      AOE, Ex. B (Jagielski Decl. ¶¶ 7-8).

[9]      AOE, Ex. B (Jagielski Decl. ¶ 9).

[10]     AOE, Ex. C (Copy of Manager's Guides).

program, Full Spectrum voluntarily paid more than *ten million dollars* in back overtime to some 3,700 Branch AEs.[11]

### C.   The Claims Certified Are All Premised on the Notion That Class Members Were Misclassified and Worked More Overtime Than They Received Through the Back Pay Program

This lawsuit was brought by Reggie Wallace, a former Branch AE who was suing Countrywide individually for race discrimination when he received his acknowledgement letter.[12]   Two additional Branch AEs from the same branch, Travin Lu'I and Erik Frates, were later added to the case as class representatives.

The three Plaintiffs have asserted claims for failure to pay statutory overtime, fraud and deceit, and for violations of the Unfair Competition Law ("UCL").  Their claims fall into essentially two categories:  (1) claims that Branch AEs were denied premium overtime pay allegedly owed to them under the California Labor Code and the FLSA ("the overtime claims"); and (2) claims that the back pay program was a fraudulent scheme designed to trick employees into releasing their overtime claims for less than the full amount owed ("the fraud claims").  To prevail on any of these clams, Plaintiffs need to establish the Branch Accounts Executives were (1) misclassified as exempt, and (2) underpaid even after the back pay program. [13]

On May 5, 2009, Judge Guilford granted Plaintiffs' motion for class certification. In so ruling, Judge Guilford certified claims on two theories.  First, he certified fraud claims, both at common law and under the UCL.  These claims were premised on a theory that Full Spectrum knew Branch AEs were owed overtime, paid them less overtime than it knew they actually worked, and deceived them into accepting less back pay than the amount they were owed.[14]  Second, Judge Guilford

---

[11]    AOE, Ex. B (Jagielski Decl. ¶ 10).

[12]    AOE, Ex. D (Wallace Dep. 88:25-89:7).

[13]    AOE, Ex. E (Final Pre-Trial Conference Order ("Fin. Pre-Trial Conf. Order"), pp. 12-16).

[14]    AOE, Ex. F (Order on Class Cert., pp. 11-12 (discussing fraud claims)).

certified the overtime claims, under the Labor Code, FLSA and UCL.

Judge Guilford indicated that a common element to all the certified claims was whether Full Spectrum paid the class for all the back overtime the class worked.[15]   Implicit in the Court's ruling was the assumption that Plaintiffs could prove classwide liability be establishing that the class, *as a whole*, was owed more pay than Full Spectrum voluntarily paid through the backpay program.

### D.   The Only Form of Collective Proof Plaintiffs Have to Prove Their Case Is The Flawed Phil Gorman Survey

The key piece of evidence Plaintiffs are using to support their case is a survey conducted by Phil Gorman, Ph.D. ("Gorman").  Gorman conducted a telephone survey that looked into the overtime hours worked by the Branch AEs between 2002 and 2004.  The underlying basis of Gorman's analysis is the notion that the overtime worked by the class can be determined by analyzing the answers to questions that a small sample of Branch AEs gave in response to the telephone survey.

For the California subclass, the only one that still has overtime claims, this entailed analyzing the answers of only 28 AEs, which is less than 3% of the California subclass.  The entire purpose of the Gorman survey is to (1) determine through evaluation of the sample AEs the amount of overtime those individuals worked, (2) translate this number into a dollar value for unpaid overtime, (3) extrapolate the sample AEs' experiences to the entire class, and (4) use that extrapolation to establish that class members, in the aggregate, were underpaid for their back pay (and the value of that underpayment).[16]   But Gorman's survey was *not* designed to establish whether any *particular* Branch AE was actually underpaid.

Ahead of the November 10, 2010 Final Pretrial Conference, Defendants filed motions *in limine* seeking to exclude (1) Gorman's survey on the ground that it did

---

[15]    AOE, Ex. F (Order Granting Class Certification, pp. 8, 10 (identifying alleged common issues that could be decided collectively)).

[16]    AOE, Ex. G (Report of Phil Gorman ("Gorman Rept.") ¶¶ 1, 3, 10-12).

7

not meet minimum *Daubert* standard; (2) a purported supplemental survey and corresponding supplemental report Gorman conducted on the ground it was disclosed after the deadline to submit an expert report; and (3) a so-called expert declaration of Dean Barron, an economist who purported to calculate the damages that would arise if the overtime worked by the class were the average value of hours reported in declarations Plaintiffs' counsel gathered, on the ground that the Barron declaration was untimely and did not comply with other requirements of Rule 26.[17]

In an Order dated December 20, 2010, Judge Guilford granted the motions *in limine* striking Gorman's supplemental survey and report and testimony from Dean Barron, both on the procedural ground that the "expert reports" were not prepared in compliance with Rule 26.  The Court denied without prejudice the motion *in limine* directed at Gorman's original survey, however.[18]   Accordingly, the Gorman survey is the ***only collective proof*** Plaintiffs have of hours worked.

### E.   The Court Allowed Depositions of Some Gorman Survey Respondents, Most of Whom Changed Their Answers

On January 5, 2011, Defendants applied *ex parte* for leave to depose at least 30 of the Gorman's 58 survey respondents.[19]   On January 7, 2011, the Court entered an order permitting depositions of only 23 survey respondents, including 15 in California.[20]   Between January 26, 2011 and March 15, 2011, Defendants took the allowed depositions.[21]   Each deponent selected worked into 2005, a period following the reclassification, such that these Branch AEs input their own hours each pay period and received overtime pay for at least part of their tenure as an AE. In addition to providing Defendants an opportunity for cross-examination of some

---

[17]     Docket Nos. 209, 213, 257.

[18]     Docket No. 257.

[19]     Docket No. 261.

[20]     Docket No. 266.

[21]     The 23rd deponent disregarded a subpoena and failed to appear for his March 15, 2011 deposition in Miami.

survey respondents, the depositions revealed that Gorman's various methodological errors resulted in a scientifically worthless survey.[22]

Defendants' survey expert, Dr. Richard Parker, submitted a declaration detailing the many flaws in Gorman's survey, including those flaws uncovered through the survey respondent depositions.[23]   Some of the major flaws included:

- Most deponents estimated their overtime with wildly different figures than they provided in response to the Gorman survey.

- Most deponents admitted that, in answering the survey questions, they did not account in their overtime calculation for weeks where they worked less because of holiday, vacation, sickness, or other reasons.

- Most deponents admitted that when they answered questions about "typical hours" worked, they provided a number that was significantly different from the "arithmetic average of hours worked per week" that Gorman purported to derive from the survey responses.

- Most deponents attested that they worked the same amount of overtime in 2005 as they worked in the class period, even though the overtime they actually recorded per week in 2005, the period of time when overtime was actually tracked, is *much* lower than they claim they worked between 2002 and 2004.

- Many deponents admitted they answered questions about their work habits from 6-8 years in the past off the top of their heads, resulting in inaccurate responses.

- Many deponents expressly admitted that their memory of events of the relevant 2002-2004 period was poor and unreliable.[24]

**F.    Plaintiffs Seek to Prove Their Overtime Claim Through Anecdotal Evidence and the Gorman Survey**

To prevail on their claims, Plaintiffs will need to establish both that Branch

---

[22]    The full analysis of those survey results is set forth in Docket No. 277, and excerpted in the concurrently filed Appendix of Evidence as Exhibit H.

[23]    AOE, Ex. I (Parker Decl. ¶¶ 3-9, 12-16, 18-19).

[24]    Kaufman Decl. ¶ 11.  Excerpts from the depositions reflecting the foregoing points are included in AOE, Exhibits J-P.

9

AEs were misclassified **and** that Full Spectrum's voluntary back pay program **underpaid** individual class members.  Importantly, these are not just "damages" issues.  If a Branch AE was exempt or was fully compensated for overtime through the back pay program, then Full Spectrum has no liability as to that class member.

It appears that Plaintiffs will attempt to prove Branch AEs were misclassified by arguing that the job was closely controlled in such a way that eliminated the exercise of discretion or independent judgment as necessary to the administrative exemption.  They will likely attempt to prove Branch AEs were underpaid for backpay, in the aggregate, through some combination of anecdotal testimony from individual Branch AEs and the Gorman survey.[25]

## G.    **Plaintiffs Have Not Presented Any Plan Regarding How They Will Prove Classwide Fraud With Collective Proof**

Plaintiffs contend that the acknowledgement letters contained fraudulent and deceptive information, and were used to obtain "releases" of wage claims.[26]  However, Full Spectrum has *never* contended that signing a letter precluded an individual employee from coming forward, asserting an FLSA or Labor Code overtime claim, and proving entitlement to more overtime than the employee received by signing an acknowledgment letter.[27]  As such, there is no need to obtain a judgment that the acknowledgment letters did not release overtime claims; this point is and always has been undisputed.  Signing a letter had no impact whatsoever on any AE's right to sue for an alleged overtime underpayment.

That issue aside, Plaintiffs have never presented any evidence that all, or even most, of the class members relied on the acknowledgment letters in such a way that caused individual AEs to suffer any damages.  For example, there is no evidence that any class member would have brought his or her own lawsuits sooner than Reggie

---

[25]    AOE, Ex. E (Fin. Pre-Trial Conf. Order pp. 28, 29, 57, 58).

[26]    Second Amended Complaint ¶¶ 18-21, 29-86.

[27]    AOE, Ex. B (Jagielski Decl. ¶ 12).

Wallace brought the original overtime lawsuit (*Wallace I*, filed in May, 2005, just a few weeks after the sending of the letters) but for allegedly false statements in the letter. Plaintiffs have merely argued that a reasonable AE ***could have*** been misled to his or her detriment by the letter, not that anybody ***actually*** was misled to his or her detriment.

The named Plaintiffs admit they were not tricked into believing they worked less overtime than they actually worked. Plaintiff Erik Frates testified that he kept detailed records of the hours he worked throughout his tenure at Full Spectrum.[28] Frates understood that Full Spectrum had no time records and had simply estimated his overtime hours, but he did not believe that the amount of back pay he was offered was fair.[29] Frates nevertheless signed the letter and received $4,388.81.[30] Tellingly, Frates testified that he did not believe that he ever waived his right to sue.

Plaintiff Lu'I testified that when he received his back pay offer, he understood from the letter that he was being offered back pay for five hours' of overtime throughout the time that he worked at Full Spectrum.[31] He understood that this offer was based on an estimate of his hours worked.[32] Lu'I actually made use of the appeals process and unsuccessfully sought to increase his back pay.[33] When Full Spectrum denied his backpay appeal,[34] Lu'i disagreed with the decision, but signed the letter anyway so he could receive back pay.[35] Lu'I also testified that he did not think he waived his right to sue by signing the letter.[36]

Plaintiff Wallace never signed his acknowledgement letter and never received

---

[28]   AOE, Ex. Q (Excerpts of Erik Frates Dep. ("Frates Dep.") 9:19-12:4).
[29]   AOE, Ex. Q (Frates Dep. 113:10-114:05).
[30]   AOE, Ex. Q (Frates Dep. 106:2-18, 123:9-23).
[31]   AOE, Ex. R (Excerpts of Travin Lu'I Dep. ("Lu'I Dep."), 80:21-83:06).
[32]   AOE, Ex. R (Lu'I Dep. 92:6-20).
[33]   AOE, Ex. R (Lu'I Dep. 76:12-79:24).
[34]   AOE, Ex. R (Lu'I Dep. 83:17-84:4).
[35]   AOE, Ex. R (Lu'I Dep. 84:9-86:16, 89:6-21).
[36]   AOE, Ex. R (Lu'I Dep. 91:11-92:5).

11

back pay.[37]  Instead, he sued only a few weeks after receiving his letter.  Thus, Wallace could not have relied to his detriment on the acknowledgement letter he received.

Furthermore, Plaintiffs' counsel submitted more than two hundred "cookie-cutter" declarations from class members where the class members filled in a few blanks on an otherwise standardized declaration form.  In the boilerplate language of each of these declarations, the class members indicate that they know the hours they worked during the relevant period, and believe the five hours per week they were offered was too low.[38]  Thus, Plaintiffs' own declarations show that class members knew their own hours and were not deceived into believing the back pay offered was fair and adequate.

In addition, of the survey respondents who Judge Guilford granted Defendants leave to depose, many testified that (1) they never read the acknowledgment letters closely,[39] (2) they signed the letters just to get the money,[40] and/or (3) they never believed that they were waiving the right to sue.[41]  In short, the record does not support that reliance or damages can be established classwide.

## III.   LEGAL ARGUMENT

### A.   Standard for Decertification

A court may decertify a class at any time before final judgment is entered should a change in circumstances render a class action no longer appropriate. *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982).  In considering a motion to decertify, the standard is the same as in a motion to certify— *i.e.*, plaintiffs must prove that they meet the requirements

---

[37]     AOE, Ex. B (Jagielski Decl. ¶ 11).

[38]     AOE, Ex. E (Fin. Pre-Trial Conf. Order pp. 32-33), *E.g.*, Ex. S (Dec. of Jenna Adams ¶ 2 ("I averaged 6-7 hours overtime per week over the 1 year(s) I was employed with FSL . . . I disagree with COUNTRYWIDE/FSL'S estimate that I worked only 5 hours overtime each week over the course of my employment with FSL.")); Docket Nos. 26 through 26-13 (Plaintiff's Compendium of Declarations).

[39]     AOE, Ex. T.

[40]     AOE, Ex. U.

[41]     AOE, Ex. V.

1  of Federal Rule of Civil Procedure 23(a) and (b).  If a plaintiff can no longer meet

2  those requirements, decertification is appropriate.  *See Wamboldt v. Safety-Kleen*

3  *Sys.*, 2010 U.S. Dist. LEXIS 105004 *7 (N.D. Cal. September 20, 2010).  To

4  maintain certification, the court must be satisfied that individual issues can be

5  managed using collective proof.  *See In re Hydrogen Peroxide Antitrust Litig.*, 552

6  F.3d 305, 311-12 (3rd Cir. 2009) (liability must be "capable of proof at trial through

7  evidence that is common to the class rather than individual to its members.")

8  **B.**   **All Plaintiffs' Claims Should Be Decertified Because They**
**Necessarily Depend on an Impermissible "Trial by Formula"**
9  **Approach to a Class Trial**

10      *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ("*Dukes*")

11 significantly impacts this action, and should lead this Court to decertify the class.

12 Although *Dukes* was a discrimination class, it clarified Rule 23 in a manner that

13 applies just as well to wage and hour class actions.  This is evidenced by the fact

14 that multiple courts have cited *Dukes* as a basis either to decertify a class or deny

15 certification in wage and hour class actions.  *See, e.g.*, *Cruz v. Dollar Tree Stores,*

16 *Inc.*, 2011 WL 2682967, at *6 (N.D. Cal. July 8, 2011) (decertifying wage-and-hour

17 class action in light of *Dukes*); *In re Taco Bell Wage and Hour Actions*, 2011 WL

18 4479730, at *2-11 (E.D. Cal. Sept. 26, 2011) (relying on *Dukes* to deny certification

19 of plaintiff's Labor Code section 203 claim); *Novak v. Boeing Co.*, 2011 WL

20 7627789 *3, 5-6 (C.D. Cal. December 19, 2011) (relying on *Dukes* to deny

21 certification in exemption case states, "[a]s in *Wal-Mart*, Plaintiffs have failed to

22 demonstrate the proof, or 'glue' holding the claims together . . ."); *Aburto v.*

23 *Verizon California, Inc.*, 2012 WL 10381 *4-6 (C.D. Cal. January 3, 2012) (relying

24 on *Dukes* to deny certification in exemption case stating, "the question of whether

25 [class members] were improperly classified as exempt will depend on answers

26 unique to each potential plaintiff"); *Hughes v. Winco Foods*, 2012 WL 34483 * 5

27 (C.D. Cal. January 4, 2012) (relying on *Dukes* to deny certification in wage-and-

28 hour case stating, "the commonality requirement is satisfied only by common

13

question 'of such a nature that it is capable of classwide resolution . . ."); *Duran v. U.S. Bank, N.A.*, 203 Cal. App. 4th 212 (2012) (discussed below).

There are two holdings in *Dukes* that are directly applicable here and that support decertification.  First, the Supreme Court explained that satisfying Rule 23(a)'s commonality prong requires that the common issues the court identifies to support certification must be central to resolution of liability, *i.e.*, "that determination of [the issue's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S.Ct. at 2551.  Second, the court in *Dukes* clarified that "Trial by Formula"— sampling a class for ***liability and damages*** and then extrapolating the result to the broader class— is not an allowable class trial procedure, but rather violates Rule 23's Enabling Act.  *Id.* at 2560 (holding that a defendant "is entitled to individualized determinations of each employee's eligibility for backpay").  That second holding was further explained and applied to a wage and hour class action in *Duran*, 203 Cal. 4th at 259.

*Dukes'* commonality holding is applicable here because, to justify continued class certification, Plaintiffs must identify common issues whose resolution will establish classwide liability.  The mere ability of Plaintiffs to identify some issues common to the class is not sufficient.  As the Supreme Court stated in *Dukes*:

> "What matters . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."

*Dukes*, 131 S.Ct. at 2551 (emphasis in the original).

Accordingly, it is insufficient for Plaintiffs to argue that the language in the acknowledgment letters is common or that the Branch AE job was performed in a consistent manner because neither of those allegedly "common issues" can establish liability without resolution of additional significant individual issues.  Given the fact that Full Spectrum agreed to pay back pay to each class member before this case was ever even initiated, and then paid some $10 million pursuant to the backpay program, the issue that has to be common is that each class member was entitled to

14

overtime pay *in an amount greater than Full Spectrum voluntarily paid that class member*.  Given the wide variation in hours worked, Plaintiffs have never explained how they can determine the answer to that question as to any particular class member short of calling that class member to testify about his or her individual work situation, a proposition that would clearly lead to an unmanageable trial.

The second holding in *Dukes* concerning Trial by Formula is even more important here because Trial by Formula is the *only* method that Plaintiffs have ever suggested they would use to prove liability and damages.  Plaintiffs seek to bypass the ability of Defendants to raise defenses as to individual class members who were fully compensated through the back pay program by instead focusing the trial on whether the class received all the back pay owed to class members *collectively*. Plaintiffs only proffered method of deciding that aggregate issue is to utilize survey responses from a tiny non-random sample of the class, to supplement those responses with anecdotes from individual Branch AEs selected haphazardly, and to ask the jury to extrapolate classwide liability and damages from this "sample."

This is identical in the relevant particulars to the defective trial procedure the trial court utilized in *Duran* that the court of appeal held to be invalid as a matter of law.  Even though *Duran* is a state court decision, it relies heavily on federal precedent to reach its results.  In fact, although the two cases are similar, the *Wallace* case presents an even starker example of Trial by Formula than was presented in *Duran*, and poses even greater due process problems.

In *Duran*, the certified class consisted of 260 U.S. Bank business banking officers ("BBOs") who asserted claims that U.S. Bank had misclassified them as exempt.  The trial court granted summary adjudication for the plaintiffs on all exemptions except the outside sales exemption.  The disputed issue for that exemption was whether the BBOs spent the majority of their work time on outside sales activity.  Over U.S. Bank's objections, the trial court determined that classwide

liability could be determined by examining a sample of 21 class members,[42] evaluating the exemption for them, and extrapolating the results to the broader class.

The trial court declined to allow U.S. Bank to introduce evidence from outside the sample and barred the introduction of declarations from 70 BBOs that established that *those* BBOs met the outside sales exemption.  The only evidence outside the sample that the court considered was the testimony of the two named Plaintiffs.  From consideration of this sample, the trial court determined that the entire class had been misclassified.  It then made findings on the overtime worked by the sample, and heard expert testimony as to how to extrapolate the damages of the sample to the class of 260 employees.  Plaintiffs' expert testified that, from the sample of 21 BBOs, the total damages owed were roughly $14 million.  The court adopted this finding and entered judgment accordingly.  *Id.* at 225, 236 fn. 35, 247.

The court of appeal reversed *and* ordered the class decertified.  *Id.* at 259, 269-270, 275.  The court of appeal noted several trial court errors, but the central error was using a sample of 21 class members to make a classwide determination of misclassification, and to preclude U.S. Bank from introducing evidence that other class members who were not included in that small sample were actually properly classified.  *Id.* at 259-261.  The court of appeal held that it was a violation of U.S. Bank's rights to decide classwide liability by extrapolating from a small subsample.  *Id.* at 259.  Indeed, the court found the trial methodology to be inconsistent with the United States' tort system because "[t]ort liability is binary: a defendant is either liable or not, and if liable, the defendant must compensate the plaintiff in full."  By contrast, sampling may establish only "an estimate of the probability that defendant is liable to any plaintiff in an arbitrarily chosen case," which does not equate to liability as to any *particular* class member.  Id. at 265, n. 72.

---

[42]   Because the trial court allowed class members to opt out after being selected from the random sample there were only 19 of the employees in the sample who were part of the initial random draw, which led to a sample of 21 with the addition of the plaintiffs.

The appellate court's conclusion was heavily influenced by *Dukes* and the Supreme Court's prohibition of "Trial by Formula."  The *Duran* court noted that the Supreme Court disapproved of a procedure by which " a small random sample of the class would serve as test cases, and the total liability and damages of the sample would simply be 'grossed up' to calculate class-wide damages*."*  Indeed, the *Duran* court noted that the prohibition on such a trial procedure was "the expression of a unanimous [Supreme] Court."  *Id.* at 259.  The *Duran* decision further noted that this bar on sampling to establish liability had already been recognized in multiple other decisions arising from within the Ninth Circuit construing Rule 23.  *Id.* at 254-257 (*citing Jimenez v. Domino's Pizza*, 238 F.R.D. 241 (C.D. Cal. 2006); *In re Wells Fargo Home Mortg. Overtime Pay Lit.*, 571 F.3d 953 (9th Cir. 2009); and *In re Wells Fargo Home Mortg. Overtime Pay Lit.*, 268 F.R.D. 604 (N.D. Cal. 2010)).

Plaintiffs' proposed trial method is even more flawed than *Duran*'s.  As narrowed through this Court's granting of partial summary judgment, the overtime subclass now consists of approximately 940 California Branch AEs, a class almost four times the size of the *Duran* class.  Yet, Plaintiffs propose to prove liability through responses to survey questions that *only 28 California subclass members answered*.  Unlike *Duran*, there is not even a pretense that these 28 class members were selected at random, and Defendant is not even being allowed to cross-examine all 28 at trial, as Judge Guilford limited Defendant to taking depositions of 15 of the 28.  The lack of available cross-examination of witnesses creates additional due process issues not present in *Duran*.  *See Arch v. American Tobacco Co., Inc.*, 175 F.R.D. 469, 489 (E.D. Pa. 1997) (depriving defendant of right to cross-examine respondents to questionnaires violated defendants' Due Process rights).

Tellingly, Phil Gorman, who conducted the survey for the Plaintiffs here, was the expert for the ***defense*** in *Duran*, and his opinion there was that using a survey along the lines of what he is offering here would be scientifically invalid:

"USB submitted another declaration from their statistical expert,

17

> **Phillip Gorman**, who pointed out the possibility of 'sampling error' if a small number of randomly selected class members were to be used to determine whether the entire class had been misclassified as exempt. Gorman further noted that even after the liability phase it would still not be possible to determine which nonsampled class members would be entitled to compensation."

*Id.* at 221 (emphasis added).

Sample size issues aside, Plaintiffs indisputably are planning to prove classwide liability through sampling. That is simply impermissible now. Because this case cannot be tried without sampling, the Court should decertify the class.

## C.   The Gorman Survey, Plaintiffs' Sole Collective Proof Should Be Excluded From Evidence

### 1.   Gorman's Survey Does Not Meet *Daubert* Standards

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993), the Supreme Court charged district courts with a "gatekeeping" function to ensure that proffered expert testimony is both reliable and relevant. *Id.* at 597. The party proffering the expert testimony bears the burden of proving that the expert's testimony satisfied Rule 702. *Id.* at 592 n.10; *Lust v. Merrill Dow Pharms., Inc.*, 89 F. 3d 594, 598 (9th Cir. 1996) (expert failed to meet burden where he "claim[ed] to rely on a method practiced by most scientists, yet present[ed] conclusions that are shared by no other scientist.").

A trial court must initially determine whether an expert has the requisite "knowledge, skill, experience, training, or education" to render an expert opinion. Fed. R. Evid. 702. Then the court must analyze and apply the "gatekeeping" requirements set forth in *Daubert*, *i.e.*, "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The *Daubert* process is applied at the class certification stage to determine whether the proffered collective

proof will serve as admissible evidence of classwide liability.  *See Akaosugi v. Benihana Nat'l Corp.*, 2012 U.S. Dist. LEXIS 42093, *4 (N.D. Cal. Mar. 26, 2012) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).

In *Daubert*, the Supreme Court held that this determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93.  The first prong of the inquiry – *i.e.*, whether the subject of the testimony is "scientific knowledge," establishes a standard of evidentiary reliability, which requires that the testimony be based on the "methods and procedures of science" and that the expert have "good grounds" for his belief.  *Id.* at 590.  An "expert's bald assurance of validity is not enough.  Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology."  *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F. 3d 1311, 1316 (9th Cir. 1995).

The second prong, which requires that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" "goes primarily to relevance" and is a question of "fit":  Is the expert testimony proffered in the case "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute?"  *Daubert*, 509 U.S. at 591 (citation omitted).  "[T]he standard for fit is higher than bare relevance."  *Martinez v. Terex Corp.*, 241 F.R.D. 631, 636 (D. Ariz. 2007) (excluding expert's testimony on design defect for lack of proper "fit").  In elucidating this "fit" requirement, the Supreme Court noted that scientific expert testimony carries special dangers to the fact-finding process because it "can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert*, 509 U.S. at 595.  Thus, "Federal judges must exclude proffered scientific evidence . . . unless they are convinced it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury."  *Daubert II*, 43 F. 3d at 1321 n.17.

1

2

### a.    Gorman Failed to Follow Established Protocols, Which Has Led to Expert Exclusion in Other Cases

3       This case deals with the field of survey research, a field with well-established

4   principles and protocols.  Numerous courts have excluded surveys under *Daubert*

5   because a survey failed to comply with those established standards.  Indeed, at least

6   one court has recognized that surveys "are conducted under standards and protocols

7   that are widely, indeed conclusively, accepted by the survey industry." *Albert v.*

8   *Warner-Lambert Co.*, 234 F. Supp. 2d 101, 105 (D. Mass 2002) (citing Shari

9   Seidman Diamond, "Reference Guide on Survey Research," Reference Manual on

10  Scientific Evidence, Federal Judicial Center (2d ed. 2000)).

11      The Ninth Circuit's opinion in *Marlo v. United Parcel Service*, 639 F.3d. 942

12  (9th Cir. 2011) is quite instructive.  The district court excluded on *Daubert* grounds

13  a proffered class member telephone survey because the plaintiff's survey expert "did

14  not know whether the survey sample was representative, did not do anything to

15  evaluate whether the sample was representative, and was unaware of any guidelines

16  for ensuring that a survey provides representative evidence."  *Marlo v. United*

17  *Parcel Service*, 251 F.R.D. 476, 485 (C.D. Cal. 2008).  The district court further

18  noted that the sample could not be deemed representative just because that

19  plaintiff's expert *started* with a random sample of 640 people to call because the

20  survey *respondents* consisted of a non-random subset of the 160 people who chose

21  to answer the telephone survey:

22      "The parties split the class members into two random samples. This,

23      however, does not establish the reliability of surveys conducted from

24      those samples. Even when one begins with a random sample, one

25      should take measures to assure that nonresponses are random and

26      provide analysis of the reasons of nonresponse. *See* Federal Judicial

27      Ctr., *Reference Manual on Scientific Evidence* 245-46 (2000 ed.); *see*

        *also* Federal Judicial Ctr., *Reference Manual on Scientific Evidence*

28      367-369 (2005-2006 ed.)"  Here, of the 614-person sample, Spain

        conducted interviews of 160 individuals. Spain did not analyze the

20

reasons for nonresponse, nor did the survey inquire of the characteristics of the respondents to allow such analysis."

*Id.*  The district court ultimately invoked *Daubert* to exclude the survey because the survey was "unrepresentative, unreliable, and ha[d] essentially no probative value." *Id.* at 486.  The Ninth Circuit affirmed.  *Marlo*, 639 F.3d. at 949.[43]

The very same flaws that led to exclusion in *Marlo* are present here.  Gorman may have started with a random sample of 200 California AEs **to telephone**, but he obtained data from only 28, and he lacks a basis to assert that the 28 respondents are representative of the broader random sample or the 940-person subclass.  When asked whether the survey sample was representative, Gorman amazingly testified that he just **assumed** it was, but that he really had no way of knowing:

> Q. But if you get something less than 400 people, there is a question of whether the people who answered are representative of the people who didn't answer?
>
> A. Somebody could question that. If people didn't answer, we don't know for sure what they would have said if they had answered. There's an assumption that they are similar to the people who did answer.
>
> Q. When you say, "there's an assumption," there's an assumption from what source?
>
> A. There's an assumption when trying to extrapolate to the class.

---

[43]   *See also Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008-1010 (N.D. Ill. 2010) (survey excluded for "failure to comply with generally accepted principles of survey research."); *Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 525 F. Supp. 2d 558, 563 (S.D.N.Y. 2007) (accumulation of defects in survey procedure warranted exclusion; Rule 702 allows exclusion where "flaws are deemed to cumulatively undermine its relevance and reliability."); *Albert*, 234 F. Supp. 2d at 105-107 (survey excluded because expert's survey conformed to "virtually none" of the standards "accepted by the survey industry."); *Ogden Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181-82 (D. Kan 2007) (public recognition survey excluded when survey universe was underinclusive, participants were unrepresentative, and survey questions were vague); *Spotless Enterprises, Inc. v. A&E Products Group L.P.*, 294 F. Supp. 2d 322, 347 (E.D.N.Y. 2003) (confusion survey severely flawed and unhelpful because done improperly).

21

Q. What's your authority for the existence of this assumption? Is this just your own personal assumption, or is there some reference you're referring to that said you should assume?

A. Well, in order to extrapolate to the class, it's a necessary assumption.

Q. Okay. So this reminds me of the economist assume a can opener jokes. If you -- you can assume that it's representative, of course; but do you have any basis for concluding that, in fact, it is representative?

A. Only that I have no reason to think anything different.

Q. So is it fair to say you just can't say one way or the other in reality whether the people you contacted are similarly situated to the people who you didn't contact? You just don't know?

A. I don't have a way to know for sure.[44]

Gorman's blatant violation of established principles of survey science was not limited to his use of an unrepresentative sample. Indeed, while Gorman identified Floyd Fowler, Don Dillman, and Jon Krosnick as three leading experts in the field of survey design, his survey used techniques that all those experts have criticized as improper. Dr. Parker documented these flaws in his expert rebuttal report.[45]

Moreover, Gorman did not cite alternative authority to justify any of his methods. Rather, his report is largely bereft of citations, and instead relies solely on his own so-called "experience" to justify his methods. Numerous cases have held

---

[44] AOE, Ex. W (Gorman Dep. 102:4-103:11).

[45] AOE, Ex. X (Parker Report, ¶¶ 17-19 (per Jon Krosnick, sample of 58 too small to yield meaningful results), ¶ 23a (futility of waiting years to ask about mundane events discussed by Floyd Fowler); ¶ 28 (asking long questions in telephone surveys criticized by Floyd Fowler); ¶¶ 31-33 (notifying respondents that survey sponsored by one side to litigation criticized as improper by Don Dillman as well as contrary to the Code of Professional Ethics and Practice of the American Association for Public Opinion Research); ¶ 46 (Gorman's 15% response rate is too low under standards of Floyd Fowler as well as Seidman-Diamond standards mentioned in *Marlo* and *Albert* decisions)). *See Mastercard Int'l Inc. v. First Nat'l Bank of Omaha*, 2004 U.S. Dist. LEXIS 2485 (S.D.N.Y. Feb. 23, 2004), *27-*30 (survey excluded under *Daubert*; sample size too small where only 52 individuals out of possible universe of 914 completed survey).

that the mere "ipse dixit" of a purported expert that his methodology is proper is insufficient to allow his survey to bypass *Daubert* gatekeeping.  *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); *see also Daubert II*, 43 F. 3d at 1316 (expert's assertion that his conclusions were "derived by the scientific method" is insufficient to render it admissible).

A further source of unreliability was Gorman's decision to gather information through a telephone survey in which people were called, without warning, and had roughly six minutes to answer 22 complicated and confusing questions concerning mundane events from six to eight years in the past.  As Dr. Parker stated in his report, the subject matter of this case is the number of hours employees worked each week, a subject of minor salience to most people.  Gorman could have used other more reliable and acceptable scientific methods, but he did not.  He could have used <u>written questions</u>, which would have (1) generated a higher response rate; and (2) allowed witnesses time to study the questions and provide more thoughtful responses.  Many respondents explained how the way they were surveyed over the telephone caused them to give unreliable and inaccurate off-the-cuff responses, many of which they changed drastically at their depositions.[46]

When taken together with the many other methodological defects in this survey, it makes this an easy case for exclusion.  No rational factfinder could use Gorman's survey to draw any reliable conclusions concerning the aggregate overtime worked by members of the class.  Gorman's serious and consistent methodological errors should lead the Court to exclude his survey in its entirety.

### b.   <u>Gorman's Survey Suffers from the "Analytical Gap" Discussed in Other Cases Excluding Survey Experts</u>

A *separate* reason for excluding survey evidence is that the questions included in the survey do not rationally relate to the purposes for which the survey

---

[46]   AOE, Ex. J, K, M.

was utilized.  The closest example to the instant case arising within the Ninth Circuit is *Lanphere Enterprises, Inc. v. Jiffy Lube International, Inc.*, 2003 U.S. Dist. LEXIS 16205 (D. Or. Jul 9, 2003), *aff'd* 138 Fed. Appx. 20 (9th Cir. 2005); *Cf. Ellis*, 657 F.3d at 982 (reversing certification even though statistical analysis had valid scientific methodology where survey nonetheless could not answer relevant question for deciding classwide liability).

In *Lanphere*, the plaintiff, an owner of several auto dealerships in the Northwest, brought an action for unfair trade practices arising out of misleading advertisements from Jiffy Lube that the plaintiff contended misled consumers from getting oil changes at Lanphere dealerships.  Lanphere commissioned a survey of Jiffy Lube customers from Northwest U.S. area codes who drove the makes and models of vehicles sold by Lanphere dealerships to assess the percentage who were diverted from Lanphere dealerships by the misleading ads.

The survey was defective, however, in that the questions it asked did not actually gather data on which customers would have used Lanphere dealerships rather than Jiffy Lube for oil changes.  Instead, the questions merely elicited how many respondents (1) *would consider* taking a car to a Lanphere dealership for *servicing*; (2) had heard the Jiffy Lube ads at issue; and (3) had been led by those ads to go to Jiffy Lube rather than *a car dealership* (not limited to Lanphere).  The expert calculated that 5.5% of the respondents were led to get oil changes at Jiffy Lube rather than Lanphere by one or more of the statements  *Id.* at *23-29.

The district court excluded the survey under *Daubert*.  The court recognized that a survey was only admissible if it provided answers to questions that were at issue in the case:  "To be admissible . . .survey evidence also must meet the relevance and helpfulness tests of *Rules 402 and 702*."  *Id.* at *16.  The court explained that, although the survey purported to address the relevant issues of the number of people diverted to Jiffy Lube, "the Court may [still] exclude an expert's opinion if there is 'too great an analytical gap' between the expert's conclusions and

the underlying data on which he relies." *Id.* at * 37.  Lanphere's survey failed that "fit" test because it determined only who, among those who would consider using Lanphere for *service* (not specifically oil changes), heard the ads and used Jiffy Lube for *oil changes* rather than a *car dealership* (not specifically Lanphere).  The analytical gap between the relevant issue and the issue surveyed was too large to allow a jury to conclude which subset of the survey respondents actually were diverted to Jiffy Lube under the relevant theory of the case.  *Id.* at * 37-*47.[47]

Similarly here, Gorman's survey contained ***only two*** questions that purport to address whether class members worked more than five hours of overtime per week on average during the class period.[48]   However, even worse, they were the ***wrong questions***.   They asked the witnesses to provide information about the hours they "worked in a *typical* week," rather than the "*average* number of overtime hours [you] worked, averaging across all weeks worked during the class period."  Gorman admitted that his inquiry may have elicited information about the "mode" or most common workweek, which is analytically distinct from the average hours worked, and could actually be ***double or triple*** the average.[49]

Furthermore, many survey respondents who were deposed admitted that they generated a "typical" week by just using their regular work schedule without adjusting for shortened weeks cause by holidays, sickness or other reasons.[50]

---

[47]     *See also Scotts Company v. United Industries Corp.*, 315 F.3d 264, 278-80 (4th Cir. 2002) (survey excluded when relevant question was whether product killed mature crabgrass, but survey asked only about distinct issue of whether product *prevented* crabgrass, which was not at issue in the case); *Learning Network, Inc. v. Discovery Communications, Inc.*, 153 F. Supp. 2d 785, 788-91 (D. Md. 2001) (survey excluded; only relevant purpose of survey was to measure confusion caused by a website but the test failed to show test subjects a reasonable facsimile of the allegedly confusing website so it could not test the relevant issue).

[48]     Gorman really used only one of the two questions.  He asked the work hours question (Q. 8) a second time in a more convoluted manner (Q. 17) and then used the answer to the longer question regardless of the answer to the original work hours question.  AOE, Ex. W (Gorman Dep. 188:20-189:13).

[49]     AOE, Ex. W (Gorman Dep. 85:17-89:21).

[50]     AOE, Ex. J, L.

Despite this distinction between typical and average hours, Gorman used the survey answers to calculate damages to the class based on the false assumption that the average of all survey respondents' "typical hours" reported in response to Question 17 was the <u>equivalent</u> of the average number of hours worked by the class.  Gorman has never provided a basis for this huge analytical leap.

As in *Lanphere*, the survey asked questions that failed to elicit responses rationally related to its conclusions.  It was as if it were asking questions about numbers of dogs a household owned to calculate the number of cats.  Information about class members' most common workweek is not relevant and highly misleading.  For this separate reason that the survey lacks the requisite "fit" to the issues of the case, Gorman's survey should be excluded in its entirety.

### 2. Plaintiffs Lack Any Other Substitute Collective Proof That Can Separate Class Members Who Were Underpaid from Those Who Were Overpaid

As a last resort, Plaintiffs are expected to call an unspecified number of non-randomly selected class members as anecdotal witnesses who will testify to their experiences working for Defendants and will demonstrate how Defendants tricked and underpaid them.  However, it is indisputable that the hours employees worked varied widely,[51] and Plaintiffs have not offered any scientific basis to extrapolate the experience of anecdotal witnesses to the broader class, nor could they.  *See Dukes*, 131 S. Ct. at 2551; *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1130-31 (N.D. Cal. 2011 (rejecting the use of representative testimony where deposition testimony "show[ed] that for every manager who says one thing about his or her job duties and responsibilities, another says just the opposite."); *see also Whiteway v. FedEx Kinkos Office and Print Servs., Inc.*, 2009 U.S. Dist. Lexis 127360, *10 (N.D. Cal. Oct. 2, 2009) (decertifying class in employment case

---

[51]   AOE, Ex. D (Wallace Dep. 64:7-67:9, 80:12-81:4), H, J, Y (Phenix Dep, 14:18-15:24, 31:10-32:20), AA.

because plaintiff could not show how testimony of 10-20 class members could be extrapolated to class as a whole).

Considering anecdotal evidence from even 100 class members would not provide any scientific basis to establish classwide liability.  Without the use of the Trial by Formula approach to prove their claims on a class-wide basis, this Court will need to conduct several hundred mini-trials to determine which AEs were overpaid and which were underpaid, an exercise completely inconsistent with class treatment.  *See McCullah v. So. Cal. Gas Co.*, 82 Cal. App. 4th 495, 500-501 (2000) (explaining that, "[i]f the ability of each member of the class to recover clearly depends on a separate set of facts applicable only to him [or her], then all of the policy considerations which justify class actions equally compel the dismissal of such inappropriate actions").  Plaintiffs have no alternative mechanism manageably to establish class-wide liability.  Accordingly, the class should be decertified.

### D.   Plaintiffs Also Lack Collective Proof Necessary to Establish Fraud, Which Should Trigger Decertification of That Claim

#### 1.   Essential Elements Of Fraud Claim

To establish their claim for fraud and deceit under California law, Plaintiffs must prove that AEs justifiably relied on a misrepresentation and that this reliance resulted in damage.  *Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1474 (1997.  The failure to prove these elements defeats the fraud claim.  *City of Hope National Medical Center v. Superior Court*, 8 Cal. App. 4th 633, 639 n.3 (1992).

Plaintiffs contend the class was defrauded by the acknowledgement letters.  They assert that the class was deceived by false statements in the letters and that their reliance on the letters caused them to suffer damages.[52]   However, Plaintiffs have no viable method of demonstrating actual reliance and resulting harm on a *classwide* basis, because reliance and damages vary from *person to person*.  Indeed,

---

[52]     AOE, Ex. E (Fin. Pre-Trial Conf. Order at 32:6-9).

even in initially certifying the class, Judge Guilford never identified any basis for classwide reliance, apparently deeming the issue immaterial to his analysis:

> "Defendants assert that [the common law fraud] claim is inappropriate for class certification, arguing the each individual class member will need to establish that he or she justifiably relied on a misrepresentation and suffered damage.  But again, 'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate.'  The Court finds that common questions, such as the question of whether the acknowledgment letters were misleading, predominate over individual issues of proof."[53]

In fact, the development of the record shows that individual reliance will be a predominant individualized issue (*see* Rule 23(a) commonality discussion above).

## 2.   <u>Plaintiffs Lack Collective Proof Of Actual Reliance</u>

Whether a particular member of the putative class reasonably relied on a misrepresentation is inherently an individualized inquiry that can be determined only though individualized analysis.  Those individuals who were not misled would not have valid fraud claims or be entitled to any recovery, so it would be improper to simply assume classwide reliance, particularly as the named Plaintiffs admitted that they themselves were *not* misled as to the amount of overtime they worked.

Plaintiffs also have sought to prove their claims by utilizing a number of class member declarations, within each of which the declarant sets out the amount of overtime the employee allegedly worked at the time.[54]   If these declarations are believed, none of the declarants was *ever* deceived as to the amount of overtime worked.  Thus, these declarants cannot establish essential elements of their individual fraud claims.

Recognizing the lack of viability of a fraud claim based on AEs not knowing

---

[53]     AOE, Ex. F (Order Granting Class Certification, p. 12 (analyzing predominance issue)).

[54]     AOE, Ex. E (Fin. Pre-Trial Conf. Order 23:10-17; 27:15-17); *E.g.*, Ex. S (Declaration of Jenna Adams ¶ 2 ("I averaged 6-7 hours overtime per week over the 1 year(s) I was employed with FSL.")); Docket No. 26 through 26-13.

their own work hours, Plaintiffs belatedly altered their theory to assert that the class was defrauded because each individual AE believed that, once he or she signed an acknowledgement letter, the AE was foreclosed from bringing legal action to recover additional overtime.[55]  This theory is also untenable because, of course, Plaintiffs *did* immediately file this action and they *are* pursuing legal action.

Even under this revised theory, an individual inquiry would still be necessary as to each Branch AE who signed a letter.  Simply shifting the nature of the class members' alleged actual reliance on a claimed misrepresentation by Full Spectrum does not change the fact that *each* Branch AE must *separately* demonstrate that he or she was actually deceived into believing that signing an acknowledgement letter foreclosed further legal proceedings to recover additional back pay, causing that person to lose backpay he or she would have otherwise recovered.  *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (for common law fraud, unlike UCL fraud claim, individual proof necessary of reliance and damages).

Furthermore, the rationale for decertification of the overtime claims also applies to the common law fraud claim.  It is undisputed that a certain number of Branch AEs were fully compensated by the back pay program, because they worked no more than five hours of overtime per week, on average.  These individuals could not have been deceived in the manner alleged by Plaintiffs, because they *had no uncompensated overtime remaining* that they could have been tricked into giving up. The only way to identify these individuals would be to question each class member.

Plaintiffs contend that the "cookie-cutter" declarations they have obtained from some class members demonstrate that the entire class was deceived by the acknowledgement letters.  These declarations, which represent a small percentage of the putative class, were clearly drafted by Plaintiffs' counsel and are of little value. *See Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 239 (C.D. Cal. 2006) (court

---

[55]     AOE, Ex. E (Fin. Pre-Trial Conf. Order, 25:10-17).

Case No. SACV 08-01463 AG (MLGx)

1  gave no weight to cookie-cutter declarations prepared by Plaintiff's counsel that

2  were identical except for a few blanks to be filled in by each putative class member

3  declarant); *Dunbar v. Albertsons*, 141 Cal. App 4th 1422, 1429 (2006) (giving little

4  weight to stack of identical declarations submitted by counsel).

5         In any event, even if one were to accept these declarations at face value, it

6  would still be improper to rely on them to assume that, for the remaining majority of

7  the class, *each individual* AE drew the same conclusion that, by signing the

8  acknowledgement letter, the AE waived the right to sue.  This is the same flaw

9  inherent in the Gorman survey.  Simply because a few survey respondents reported

10 to working additional overtime not compensated by the back pay program, this does

11 not establish that the *whole class* worked similar hours, nor that the whole class

12 relied on a misrepresentation that caused it to give up payment for such overtime.

13 As discussed above, the holdings in *Dukes* and *Duran* have clarified that class

14 liability cannot be established by extrapolating a small sample to the broader class.

15        In sum, because Plaintiffs cannot identify any method of proving the essential

16 elements of their fraud claim on a classwide basis, in compliance with due process as

17 explained in *Dukes* and *Duran,* the fraud claim should be decertified.

18 **IV.   CONCLUSION**

19        For the foregoing reasons, Defendants respectfully request that the Court

20 decertify the class.

21 DATED:  April 6, 2012          SHEPPARD MULLIN RICHTER & HAMPTON LLP

22

23                               By    _____/s/ Thomas R. Kaufman_____

24                                        THOMAS R. KAUFMAN
                                          Attorneys for Defendants
25

26

27

28

30